**Eli S. HANNOY, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A05–0206–CR–282.**

Court of Appeals of Indiana.

June 10, 2003.

without being aware of the corresponding specific intent to kill.

J.J. Paul, III, Voyles Zahn Paul Hogan & Merriman, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen J. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Eli Hannoy appeals his two convictions for operating a motor vehicle with a blood alcohol content of .10 percent or greater and causing death, which is a Class C felony. We reverse and remand.

### Issues

The dispositive issue is whether the trial court erroneously admitted into evidence the results of a blood test that indicated he was intoxicated obtained after police ordered Hannoy's blood to be drawn without probable cause and without requesting his consent. For purposes of a potential retrial, we also address the admissibility of the results of a second blood test conducted by the hospital where Hannoy was treated.

### Facts

On the night of August 11, 2000, Hannoy drove his minivan across the centerline of Fall Creek Road in Indianapolis and collided head-on with a car driven by John Wells and also occupied by Flora Wells. Flora was pronounced dead at the scene, and John died as a result of his injuries several days later. Pursuant to the stan-

dard policy of the Marion County Sheriff's Department, Deputy Brian Dixon was dispatched to Community North Hospital, where Hannoy had been transported, to request hospital staff to draw Hannoy's blood for purposes of testing it for alcohol. Deputy Dixon did not ask for Hannoy's consent before a nurse performed the draw; nor did any law enforcement officer have probable cause to believe Hannoy was intoxicated at the time the draw was made. The Sheriff Department's policy also provided that a blood sample of a driver involved in an accident resulting in serious bodily injury or death would be obtained by force, if necessary. App. p. 662.

Testing of the blood obtained at Deputy Dixon's request indicated that Hannoy had a blood alcohol content between .194 and .206 percent. The hospital performed a second blood draw on Hannoy for its own purposes approximately one hour after the draw requested by Deputy Dixon. Testing of this blood sample indicated a blood alcohol content of between .182 and .193 percent.

The State charged Hannoy with two counts of operating a vehicle while intoxicated resulting in death, two counts of operating a vehicle with a blood alcohol content above .10 percent resulting in death, and two counts of reckless homicide, all Class C felonies, and two counts of operating a vehicle while intoxicated resulting in serious bodily injury, Class D felonies. Hannoy moved to suppress the results of both blood tests; the trial court denied the motions. On March 25, 2002, the case proceeded to a bench trial, but only on the operating with a blood alcohol content above .10 percent resulting in death charges. The State dismissed the other charges. The trial court found Hannoy guilty on both counts, and he now appeals.

## Analysis

### I. Introduction of Blood Test Results from Sample Requested by Law Enforcement

 Hannoy challenges the trial court's admission of the blood alcohol content test results from the blood sample obtained at Community North Hospital at Deputy Dixon's request. Hannoy moved to suppress these results and also renewed his objection to them at trial. We review a trial court's determination as to the admissibility of evidence for an abuse of discretion and will reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Smith v. State,* 754 N.E.2d 502, 504 (Ind.2001). Additionally, the trial court here entered findings of fact and conclusions thereon when it denied Hannoy's motion to suppress and it later overruled his objection to the evidence "for the reasons previously stated in the record." App. pp. 1520–21. In reviewing a decision entered with findings and conclusions, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *E & L Rental Equip., Inc. v. Wade Const., Inc.,* 752 N.E.2d 655, 658 (Ind.Ct.App.2001). Findings of fact are clearly erroneous only when the record lacks any evidence to support them. *Id.* We review questions of law under a de novo standard, however, and owe no deference to a trial court's legal conclusions. *Wayne Metal Prod. Co. v. Indiana Dep't of Envtl. Mgmt.,* 721 N.E.2d 316, 317 (Ind. Ct.App.1999), *trans. denied.*

Hannoy does not challenge the trial court's factual findings on this issue. The key facts for our review are that the trial court found, inter alia, that "Deputy Dixon had not developed probable cause to believe defendant was intoxicated at the time he ordered [the] blood draw," and that "Deputy Dixon did not discuss or request

Mr. Hannoy's consent prior to the blood draw." App. pp. 304–05. Hannoy does vigorously assert that the trial court's legal conclusions with respect to Indiana's implied consent statutes and the constitutionality of the search at issue are incorrect. We review these legal conclusions de novo.

▆▆▆ In general, the Fourth Amendment prohibits warrantless searches. *Edwards v. State*, 762 N.E.2d 128, 132 (Ind. Ct.App.2002), *trans. denied.* If the search is conducted without a warrant, the burden is upon the State to prove that, at the time of the search, an exception to the warrant requirement existed. *Id.* Searches conducted without a warrant are per se unreasonable subject to a few well-delineated exceptions. *Johnson v. State,* 766 N.E.2d 426, 432 (Ind.Ct.App.2002), *trans. denied.* A warrantless search of one's person ordinarily must also be supported by probable cause. *Conwell v. State,* 714 N.E.2d 764, 766 (Ind.Ct.App.1999). A knowing and voluntary consent to search obviates the need for a warrant and probable cause, but unlike a probable cause or warrant search, a consent search allows for a suspect to limit or restrict the search as he or she chooses. *See Krise v. State,* 746 N.E.2d 957, 961, 964 (Ind.2001).

We initially address the application of Indiana's implied consent statutes to this case. Indiana Code Chapter 9–30–6 provides that an officer shall offer a chemical test when he or she has probable cause to believe a driver is intoxicated. *Brown v. State,* 744 N.E.2d 989, 993 (Ind.Ct.App. 2001). Failure to submit to an offered chemical test results in suspension of the driver's license. Ind.Code § 9–30–6–7. However, it is Indiana Code Chapter 9–30–

7 that arguably applies in this case. For purposes of this chapter, police shall offer a chemical test to any driver whom the officer has probable cause to believe was involved in an accident resulting in serious bodily injury or death. *Brown,* 744 N.E.2d at 993. As under Chapter 9–30–6, drivers impliedly consent to such a test and, if they refuse to take an offered test, a penalty attaches. The civil penalty under Chapter 9–30–7 for refusing to submit to an offered chemical test is a Class C infraction and suspension of the driver's license for up to one year.[1] I.C. § 9–30–7–5.

At the time of Hannoy's accident and trial, the Marion County Sheriff's Department had a standard policy assuming that in any motor vehicle accident resulting in serious bodily injury or death, the implied consent provisions of Chapter 9–30–7 automatically authorized obtaining the blood of the driver of each involved vehicle for testing purposes, by force if necessary. This policy applied regardless of whether consent from the driver was actually sought and obtained and whether there was probable cause that the blood would uncover evidence of alcohol or illegal substance consumption. There is no evidence in this case that Deputy Dixon "offered" a chemical test to Hannoy; he simply requested medical personnel to perform the blood draw. Hence, there was no compliance with the implied consent law itself.

▆▆▆ Thirteen years ago, this court considered a factually similar case decided under the predecessor to current Indiana Code Chapter 9–30–6, the implied consent law applicable where police have probable cause that a driver is intoxicated. We held

---

1. Of course, police could always "offer" or ask for any driver's consent to a chemical test, regardless of whether they had probable cause to believe the driver was intoxicated or was involved in an accident resulting in seri- ous bodily injury or death. The difference in such a scenario is that the implied consent statutes would not be implicated and the driv- er could not be penalized for refusing to sub- mit to such a test.

that where a police officer obtained a defendant's blood sample after the defendant was told of the implied consent law but refused to consent, the officer's conduct violated the guidelines contained in the implied consent laws and the seizure of the blood sample was unlawful. *Justice v. State,* 552 N.E.2d 844, 848 (Ind.Ct.App. 1990). We noted that the penalty for refusing to consent was suspension of the driver's license and nothing in the statutes at that time authorized police to obtain a blood sample if a person refused consent. *Id.* Here, Deputy Dixon never advised Hannoy of the implied consent law at all and never sought Hannoy's actual consent, certainly representing much less compliance with the implied consent law than the facts in the *Justice* case. Nothing in Indiana Code Chapter 9–30–7 authorizes an officer to forcibly take a blood sample if actual consent to a chemical test is not obtained. Rather, as with Chapter 9–30–6, there are civil penalties if the person refuses to submit. Therefore, following *Justice,* Deputy Dixon's failure to comply with the guidelines of the applicable implied consent laws means that those laws cannot be invoked to justify the drawing of Hannoy's blood.

■ Next, we address the constitutionality of the Marion County Sheriff Department's policy, followed in this case, of obtaining blood samples without probable cause from drivers involved in accidents resulting in serious bodily injury or death or obtaining consent to performing a chemical test. The State urges that we should hold this policy to be constitutional under the "special needs" exception to the usual probable cause prerequisite for a government search under the Fourth Amendment. We conclude we are constrained by clear precedent from the United States Supreme Court that the "special needs" exception cannot be invoked in this case or cases similar in nature.

The seminal case concerning the nonconsensual and warrantless law enforcement seizure of a blood sample from a driver involved in a motor vehicle accident is *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). There, the Supreme Court began by noting that the "compulsory administration of ... blood test[s] ... plainly constitute searches of 'persons'" within the meaning of the Fourth Amendment. *Id.* at 767, 86 S.Ct. at 1834. The Court held that the warrantless and nonconsensual taking of the defendant's blood constituted a reasonable search and seizure incident to the defendant's arrest under the Fourth Amendment for four reasons: (1) the officer "plainly" had probable cause that the defendant had been operating a vehicle under the influence of alcohol, giving rise to probable cause that the testing of the defendant's blood would reveal the presence of alcohol; (2) the rapid diminishment of blood alcohol content after drinking stops justified proceeding with the search without first obtaining a warrant; (3) the blood test was a reasonable method of measuring the defendant's blood alcohol level; and (4) the test was performed in a reasonable manner. *Id.* at 768–72, 86 S.Ct. at 1834–36.

The Supreme Court offered the following strongly-worded caveats, however. First:

The interests in human dignity and privacy which the Fourth Amendment protects forbids any [intrusions beyond the body's surface] on the mere chance that desired evidence might be obtained. *In the absence of a clear indication that in fact such evidence will be found,* these fundamental human interests require law officers to suffer the risk that such

evidence may disappear unless there is an immediate search.

*Id.* at 769–70, 86 S.Ct. at 1835 (emphasis added). Second:

> It bears repeating ... that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

*Id.* at 772, 86 S.Ct. at 1836. It is patently clear that the *Schmerber* court did not contemplate that law enforcement would be entitled to obtain a person's blood without a warrant, without probable cause, and without the person's consent.

■ During the past fifteen years, the Supreme Court has carved out a "special needs" exception to the general Fourth Amendment requirement of individualized suspicion or probable cause before the government may conduct a search, and this exception has been extended to cases involving the provision of blood and urine samples to test for alcohol and/or illegal drugs. The Supreme Court, however, has never approved of suspicionless searches requiring the provision of a urine or blood sample where the search was performed by law enforcement or was performed for law enforcement purposes. In fact, the express wording of the "special needs" exception is that it applies "when 'special needs, *beyond the normal need for law enforcement,* make the warrant and probable-cause requirement impracticable.'" *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989) (emphasis added) (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97

L.Ed.2d 709 (1987)). The *Skinner* decision, in particular, approved the Federal Railroad Administration's regulations that required railroad employees involved in train accidents to submit to blood and urine tests to search for alcohol or drug use. The *Skinner* court expressly noted that the toxicological tests were *not* intended "to assist in the prosecution of employees, but rather 'to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.'" *Id.* at 620–21, 109 S.Ct. at 1415 (quoting 49 C.F.R. § 219.1(a) (1987)).

In the Supreme Court's most recent foray into the realm of suspicionless drug testing, it again was clear, albeit in dicta, that the "special needs" exception does not apply to law enforcement-related searches. In 2002, the Supreme Court approved a school district's requirement that any student involved in extracurricular activities submit a urine sample to test for illegal drug use. *Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls,* 536 U.S. 822, 837–38, 122 S.Ct. 2559, 2569, 153 L.Ed.2d 735 (2002). In reaching that conclusion, it stated, "[i]n the criminal context, reasonableness usually requires a showing of probable cause." *Id.* at 828, 122 S.Ct. at 2564. The probable cause standard "'is peculiarly related to criminal investigations' and may be unsuited to determining the reasonableness of *administrative searches* where the 'Government seeks to prevent the development of hazardous conditions.'" *Id.* (emphasis added) (quoting *National Treasury Employees v. Von Raab,* 489 U.S. 656, 667–68, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)). The Court also noted that a search unsupported by probable cause may be reasonable "in the context of *safety and administrative regulations* ...." *Id.* at 829, 122 S.Ct. at 2564

(emphasis added). *Cf. also Linke v. Northwestern School Corp.*, 763 N.E.2d 972, 982 (Ind.2002) (holding that suspicionless drug tests of students participating in extracurricular activities were not unreasonable searches and seizures under Article I, § 11 of Indiana Constitution, but only after stating that "a preventative or rehabilitative search conducted by a school corporation is substantively different than a search conducted to enforce the law" and noting that test results were not volunteered to law enforcement agencies or used for school disciplinary purposes).

One year earlier, the Supreme Court more concretely stated, in invalidating a hospital's law-enforcement related suspicionless and nonconsensual testing of pregnant women for illegal drug consumption, that it was doing so "because the immediate objective of the searches was to generate evidence for law enforcement purposes...." *Ferguson v. City of Charleston*, 532 U.S. 67, 83, 121 S.Ct. 1281, 1291, 149 L.Ed.2d 205 (2001). Because the primary purpose of the test was to threaten the prosecution of women who tested positive for cocaine, "and given the extensive involvement of law enforcement officials at every stage of the policy, this case simply does not fit within the closely guarded category of 'special needs.'" *Id.* at 84, 121 S.Ct. at 1292. The Court also noted that the key distinction between the case before it and cases such as *Skinner* was that "the 'special need' ... advanced as a justification for the absence of a warrant or individualized suspicion [in *Skinner* and the like] was one divorced from the State's general interest in law enforcement." *Id.* at 79, 121 S.Ct. at 1289. *See also Chandler v. Miller*, 520 U.S. 305, 314, 117 S.Ct. 1295, 1301, 137 L.Ed.2d 513 (1997) (holding that "to be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing," but that "[w]hen

... 'special needs'—*concerns other than crime detection*—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." (emphasis added)).

We also find guidance in *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In that case, the Supreme Court approved the law enforcement use of sobriety checkpoints, which involved the brief, suspicionless seizure of each motorist passing through the checkpoint and basic questioning and observation of the driver by police in order to detect signs of intoxication. *Id.* at 450–51, 110 S.Ct. at 2485. The Supreme Court expressly stated that its opinion was limited to the legality of this procedure and that "[d]etention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard." *Id.* Clearly, if compulsory field sobriety testing by law enforcement officers requires some level of individualized suspicion, the much more intrusive act of placing a needle into a person's arm to withdraw blood requires it as well. Additionally, *Sitz* concerned the use of a brief, suspicionless seizure as a preventative safety measure, not as a prosecutorial investigative tool. In sum, our review of the Supreme Court's "special needs" search and seizure cases leave us with the firm belief that it did not, and does not, intend to expand that particular exception to the warrantless, suspicionless, nonconsensual drawing of a person's blood by law enforcement as part of a criminal investigation. In fact, *Schmerber* remains the only case directly on point with the facts in this case, and it clearly requires the existence of probable cause that a driver's blood will contain evidence of alcohol or illegal substances before a law enforce-

ment officer may order it to be drawn and tested, in the absence of the person's consent. Unless the Supreme Court decides to expressly overrule the probable cause requirement of *Schmerber,* we are bound to follow that decision so far as law enforcement-criminal investigation searches are concerned.[2]

The Mississippi and Pennsylvania Supreme Courts have come to conclusions similar to the one we reach today. In *McDuff v. State,* 763 So.2d 850 (Miss.2000), the Mississippi Supreme Court invalidated as unconstitutional an implied consent statute that mandated the blood testing of any driver involved in an accident resulting in death. It noted, inter alia, that the statute was "prosecutorial, not preventive in nature. Furthermore, the tragic fact that a fatality arises out of a motor vehicle accident is in no way, standing alone, an indicator that alcohol or drugs were involved." *Id.* at 855. In *Commonwealth v. Kohl,* 532 Pa. 152, 615 A.2d 308 (1992), the Pennsylvania Supreme Court also held that the commonwealth's implied consent statute requiring a blood alcohol test of a driver involved in an accident resulting in death or any injury requiring medical treatment was unconstitutional. It rejected the commonwealth's "special needs" argument,

holding that *Skinner* was inapplicable in this context and the commonwealth's interest in gathering evidence of intoxication or drug use to be used in a criminal proceeding did not "justify departure from the probable cause requirements of the Fourth Amendment." *Id.* at 164, 615 A.2d at 314. *Cf. also People v. Sugarman,* 96 Cal. App.4th 210, 215, 116 Cal.Rptr.2d 689, 692 (2002) (applying *Schmerber* test, including probable cause of intoxication, for determining admissibility of nonconsensual blood test); *State v. Murry,* 271 Kan. 223, 227, 21 P.3d 528, 532 (2001) (same); *State v. Jordan,* 7 S.W.3d 92, 98 (Tenn.Crim. App.1999) (same); *State v. O'Loughlin,* 270 N.J.Super. 472, 489, 637 A.2d 553, 562 (1994) (same).

Here, we need not invalidate Indiana's implied consent law with respect to automobile accidents resulting in serious bodily injury or death. Nor does Hannoy ask that it be declared unconstitutional. This is because we have previously and explicitly held that it is constitutional precisely because it "does not authorize a search or seizure." *Griswold v. State,* 725 N.E.2d 416, 419 (Ind.Ct.App.2000), *trans. denied.*[3] We went on to state:

---

**2.** We are aware that in *Shultz v. State,* 417 N.E.2d 1127, 1137 (Ind.Ct.App.1981), this court stated that *Schmerber* found "no constitutional impediment to drawing a blood sample to determine the physical condition of a suspect. . . ." This is clearly an overstatement of *Schmerber*'s holding, as it only held the blood draw to be constitutional because it was done upon probable cause, exigent circumstances existed, and the test and the manner in which it was performed were reasonable, and the Supreme Court explicitly limited its holding to the existence of those particular circumstances.

**3.** The implied consent law with respect to probable cause that a driver is intoxicated does authorize the forcible taking of a blood sample if a driver refuses consent, but only if

a law enforcement officer certifies in writing that there is probable cause the driver was operating a vehicle while intoxicated, the driver has been transported to a hospital or other medical facility, the driver was involved in an accident resulting in serious bodily injury or death, and the accident occurred not more than three hours before the time the sample is requested. I.C. § 9–30–6–6(g). It is likely that this section complies with *Schmerber*'s probable cause and overall reasonableness requirements. There is no similar provision in the serious bodily injury/fatality implied consent law, and such a provision would be unconstitutional in the absence of probable cause of the driver's consumption of alcohol or drugs.

IC § 9–30–7–2 merely requires a driver involved in a fatal accident or one involving serious bodily injury to submit to a test offered by a police officer pursuant to IC § 9–30–7–3 in order to comply with the implied consent law in Indiana and to avoid the mandatory sanctions set forth in IC § 9–30–7–5.... *It does not require a driver to submit to a chemical test....* Although he would have been sanctioned for refusing the offered test of his blood, Griswold retained the option to refuse to submit to the chemical test. Because chapter seven does not require a search or seizure, it does not violate the right to be free from unreasonable searches and seizures and is therefore not unconstitutional.

*Id.* at 420 (emphasis added); *see also Brown,* 744 N.E.2d at 993. In other words, it is clear that the legislature can condition the privilege of driving upon submitting to a chemical test if a driver is involved in an accident resulting in serious bodily injury or death, and the State can suspend that privilege if the driver does not submit. The legislature cannot, however, abrogate a person's Fourth Amendment right to be free from unreasonable searches and seizures, as defined by the Supreme Court. *See, e.g., Ybarra v. Illinois,* 444 U.S. 85, 96, 100 S.Ct. 338, 345 n. 11, 62 L.Ed.2d 238 (1979) (invalidating state statute authorizing searches without probable cause or warrant and noting that Supreme Court will not hesitate to hold such statutes unconstitutional). To hold that the legislature could nonetheless pass laws stating that a person "impliedly" consents to searches under certain circumstances where a search would otherwise be unlawful would be to condone an unconstitutional bypassing of the Fourth Amendment.

We would also note that even in the context of the "special needs" searches approved by the Supreme Court, submission to the search as a required prerequisite for enjoying a privilege has not caused those cases to be analyzed as whether there was a constitutionally valid, knowing, and voluntary consent to the search under traditional Fourth Amendment consent search principles, although such consent may be relevant in determining the searched person's reasonable expectation of privacy. *See National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 1391, 103 L.Ed.2d 685 (1989) (addressing suspicionless, warrantless drug testing of Customs employees where they were aware they had to take drug test when applying for certain jobs). If this type of "required" consent that must be given in order to enjoy a privilege, similar to the "implied" consent present here, had been enough by itself to exclude a search from the probable cause and warrant requirements, there would have been no need in those cases to engage in a "special needs" analysis, so we must assume the Supreme Court does not view this type of consent as constitutionally sufficient. If this type of consent is insufficient by itself to justify a "special needs" search, statutory "implied consent" certainly would be insufficient in the context of a law enforcement search where the "special needs" balancing test cannot be invoked.

The State argues, in the alternative to its "special needs" argument, that the implied consent statute combined with Hannoy's failure to resist the nurse's drawing of his blood even though, as the State claims, he was aware Deputy Dixon was requesting that it be drawn constituted his actual consent to the blood test. We disagree. A consent to a search, as an exception to the Fourth Amendment's warrant and probable cause requirements, must be knowingly and voluntarily given. *Krise v. State,* 746 N.E.2d 957, 961 (Ind.

2001). "When the State relies upon consent to justify a warrantless search, it has the burden of proving that the consent was, in fact, freely and voluntarily given." *Ammons v. State,* 770 N.E.2d 927, 933 (Ind.Ct.App.2002), *trans. denied.* A consent to search is invalid if it is procured by fraud, duress, fear, intimidation, or where it is merely a submission to the supremacy of the law. *Callahan v. State,* 719 N.E.2d 430, 435 (Ind.Ct.App.1999). Consent cannot be conclusively presumed from a verbal expression of assent unless the court determines, from the totality of the circumstances, that the verbal assent reflected an understanding, uncoerced, and unequivocal election to grant the officers a license which the person knows may be freely and effectively withheld. *Id.*

 The State's claim that Hannoy was aware why his blood was being drawn is refuted by Deputy Dixon's own testimony. He stated that he never discussed the implied consent law with Hannoy, never told him why the blood was being drawn, never asked for his consent, and indeed had no conversation with Hannoy while he was at the hospital. The trial court credited this testimony when it found that "Deputy Dixon did not discuss or request Mr. Hannoy's consent prior to the blood draw." App. p. 305. The State would have us reweigh the evidence and consider the testimony of the nurse who drew Hannoy's blood, who recalled that Deputy Dixon told Hannoy, "you have been involved in a car accident, it is my duty to check your blood for blood alcohol." App. p. 704. This can hardly be construed as a request for Hannoy's consent; it clearly implied that the

drawing of Hannoy's blood was mandatory, as Deputy Dixon in fact believed it was, and that Hannoy had no choice in the matter. Any "consent" given in response to such a statement can only fairly be characterized as a mere submission to the supremacy of the law and not freely and voluntarily given.[4] As such, the State has failed to meet its burden that Hannoy gave his actual, knowing, and voluntary consent to the drawing and testing of his blood for law enforcement purposes.

 The requirements of the Fourth Amendment cannot be lowered based upon the heinousness of the particular crime police are investigating. We are well aware of the pain and suffering inflicted by intoxicated drivers on our roads. Nevertheless, we do not perceive that our opinion today, which will apparently require alterations in the standard policy of at least one major Indiana law enforcement agency, will unduly burden law enforcement officers in collecting blood alcohol readings in cases such as this. First, it should have been a relatively simple matter to comply with the implied consent statutes and actually ask for Hannoy's consent to the blood draw instead of presenting it as a fait accompli. Second, we observe that Deputy Jason Baker, the initial lead investigator into the accident, developed sufficient probable cause to believe Hannoy had been operating a vehicle while intoxicated shortly after arriving at the accident scene and after talking to several witnesses, but after he had already issued the order to Deputy Dixon to obtain a sample of Hannoy's blood and shortly after

---

4. If Deputy Dixon had complied with the implied consent law and advised Hannoy of the possible penalties if he did not submit to a chemical test, and if Hannoy had thereafter consented, the consent would have been knowing and voluntary despite the penalty advisement. *See Cochran v. State,* 771 N.E.2d 104, 108 (Ind.Ct.App.2002), *trans. denied.* In such a case, however, Hannoy would at least have been given the opportunity to actually consent to the blood draw instead of simply allowing the nurse to draw his blood after Deputy Dixon said he had a "duty" to test it.

it was in fact drawn. A short delay in issuing the order would have ensured that the blood draw would have complied with *Schmerber* and the Fourth Amendment, while still ensuring that the blood alcohol content of Hannoy's blood would not have diminished significantly.[5] Additionally, the amount of evidence needed to supply probable cause of operating while intoxicated is minimal; we have held that noticing the odor of alcohol on the driver's breath during the course of an accident investigation can be sufficient. *See Clark v. State,* 175 Ind.App. 391, 397, 372 N.E.2d 185, 189 (1978).[6] Thus, developing probable cause of intoxication before ordering a blood draw on a driver will not be onerous in most situations. Finally, we discuss in Part II another viable option of obtaining blood alcohol evidence that may be available to law enforcement agencies in many, if not most, cases. To the extent our holding today may lead to the loss of blood alcohol or illicit drug content evidence in some cases, we heed the words of the Supreme Court in *Schmerber* that the Fourth Amendment imposes limitations on the ability of police to investigate criminal activity and sometimes requires police to "suffer the risk" that certain evidence thereby will not be obtained. 384 U.S. at 770, 86 S.Ct. at 1835.

The withdrawal of Hannoy's blood was not obtained pursuant to the guidelines in the implied consent statutes and cannot be justified as being drawn in accordance with those statutes. The withdrawal was not accomplished in accordance with the Fourth Amendment and *Schmerber* because there was no probable cause to believe Hannoy was intoxicated at the time his blood was drawn and no actual, knowing, and voluntary consent to the withdrawal. The "special needs" exception to

the probable cause requirement cannot be applied in the context of a criminal investigation by law enforcement. Therefore, the blood alcohol content evidence obtained from the blood draw performed at the request of law enforcement was illegally obtained and should not have been admitted into evidence by the trial court.

We now must determine whether the introduction of these blood test results was harmless error. Where evidentiary error has occurred, reversal is not required if it is apparent that the fact finder did not rely upon the improper evidence in reaching the verdict. *O'Neal v. State,* 716 N.E.2d 82, 86 (Ind.Ct.App.1999), *trans. denied* (2000). In determining whether improper evidence was relied upon in reaching a verdict, we must consider the probable impact of the evidence upon the fact finder. *Id.* This court may conclude that the trial court did not rely upon improper evidence where there was other overwhelming evidence of guilt. *Id.* In the present case, it is true that a second set of blood alcohol test results was admitted into evidence, which was performed by a hospital lab on a sample drawn by the hospital for its own purposes. However, in this case it is clear that the trial court relied almost exclusively upon the blood alcohol test performed by law enforcement on the sample drawn at Deputy Dixon's request, not the later test performed by the hospital. In announcing Hannoy's guilt following the bench trial, the trial court stated that it gave "minimal weight" to the hospital test, apparently due to alleged testing irregularities with that particular sample. App. p. 1565. Additionally, Hannoy was tried and convicted only on the operating a vehicle with a blood alcohol content greater than .10 percent resulting

---

5. The State does not argue "inevitable discovery" in this case.

6. Here, law enforcement did not possess even this minimal amount of information.

in death charges, which required proof of Hannoy's blood alcohol content pursuant to a chemical analysis. *See Melton v. State,* 597 N.E.2d 359, 361 (Ind.Ct.App.1992), *trans. denied.* Given these circumstances, we cannot say that admission of the blood test results performed on the blood sample illegally obtained by law enforcement was harmless. We must reverse Hannoy's convictions. Because there was sufficient evidence to sustain Hannoy's convictions, including the improperly admitted evidence, he may be retried on remand. *See Stahl v. State,* 686 N.E.2d 89, 94 (Ind.1997).

## II. Admission of Blood Test Results from Hospital Sample

Because the issue may arise again on remand, we now consider whether the trial court abused its discretion in admitting into evidence the blood test results obtained by Community North Hospital on blood it drew from Hannoy for its own purposes approximately one hour after the sample drawn at Deputy Dixon's request. The essence of Hannoy's argument is that Indiana Code Section 9–30–6–6(a) is unconstitutional because it allows police to acquire indirectly what we have held they cannot acquire directly: blood alcohol test results without probable cause, a warrant, or actual consent. Section 9–30–6–6(a) requires a physician or other person who has obtained the results of a chemical test on a person's blood or urine, or a blood or urine sample, to deliver the results or the sample itself to a law enforcement officer who requests them as part of a criminal investigation. We need not rule today on the facial constitutionality of all of Indiana Code Section 9–30–6–6(a)'s mandatory disclosure requirements, however. We will only consider whether Deputy Baker's obtaining of Hannoy's blood test results performed by the hospital was reasonable under the Fourth Amendment under the particular facts and circumstances of this case: where Deputy Baker requested and received the results of a blood alcohol test performed by the hospital for its own treatment purposes.

■■■■■ In order for the Fourth Amendment to be implicated by a governmental search, a person must have a legitimate expectation of privacy in the thing searched. *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983). A legitimate expectation of privacy involves two components: (1) an actual, subjective expectation of privacy (2) that society recognizes as reasonable. *Smith v. State,* 744 N.E.2d 437, 439 (Ind. 2001). First, we note that the evidence in this case is that the second blood draw and alcohol test were performed entirely at the hospital's or its doctors' instigation for diagnostic purposes. There was no law enforcement involvement in the taking or testing of this blood sample. The only possible governmental "search" or "seizure" at issue here is Deputy Baker's after-the-fact obtaining of the test results. As such, the Supreme Court's recent decision in *Ferguson v. City of Charleston,* 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) is not implicated.

As we discussed in Part I, the Supreme Court in *Ferguson* invalidated as violating the Fourth Amendment a program operated by a state hospital, in conjunction with law enforcement, to test pregnant women for cocaine use without suspicion or their consent, where the program was operated for the law enforcement purpose of prosecuting women who tested positive. *Id.* at 84–85, 121 S.Ct. at 1291–92. The Supreme Court was quite clear, however, that it was distinguishing the case before it "from circumstances in which physicians or psychologists, in the course of ordinary medical procedures aimed at helping the patient herself, come across information that un-

der rules of law or ethics is subject to reporting requirements...." *Id.* at 80–81, 121 S.Ct. at 1290. Additionally, although the Supreme Court stated, "The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent," it tempered that observation by acknowledging that the existence of a statutory mandatory reporting requirement "might lead a patient to expect that members of the hospital staff might turn over evidence acquired in the course of treatment to which the patient had consented...." *Id.* at 78, 121 S.Ct. at 1288–89 n. 13.[7] "We do not address a case in which doctors independently complied with reporting requirements." *Id.* at 85, 121 S.Ct. at 1292 n. 24. Hence, the *Ferguson* court was quite clear that its rejection of the suspicionless, nonconsensual turning over of drug test information to law enforcement applied only to situations where the testing was done for and in conjunction with law enforcement.

 Hannoy argues, however, that he had a reasonable expectation of privacy in his blood test results maintained in the hospital's records and that police could not obtain those results in the absence of probable cause, Hannoy's consent to their release, and/or a court order of some kind. To the extent Hannoy does have an expectation of privacy in his medical records generally, we conclude that in Indiana at least, society does not recognize a reasonable expectation of privacy in blood alcohol test results obtained and recorded by a hospital as part of its consensual treatment of a patient, where those results are requested by law enforcement for law enforcement purposes only in the investigation of an automobile accident. As our supreme court indicated in *Oman v. State*, 737 N.E.2d 1131, 1146 (Ind.2000), drivers in Indiana "should have little or no expectation of privacy in a post-accident test result that indicates the presence of" drugs or alcohol. In particular, Indiana Code Section 9–30–6–6(c) abrogates the statutory physician-patient privilege with respect to toxicological test results when they are requested by law enforcement as part of a criminal investigation. *Hurt v. State*, 553 N.E.2d 1243, 1246 (Ind.Ct.App. 1990). That privilege is a legislative creation and it is the legislature's prerogative to define its scope. *Id.* Additionally, once a person has consented to a health provider's taking and testing of their blood, which in modern society also entails a release of any information thereby obtained to other appropriate parties such as insurance companies, we see little justification for preventing law enforcement from also obtaining that information.[8] Furthermore, law enforcement must turn over samples of test results directly to the prosecutor, who can only use them as evidence in a criminal proceeding. I.C. § 9–30–6–6(e). General public disclosure of a person's toxicological test results is not permitted.

---

7. Footnote 13 concluded that a mandatory reporting statute would not, however, lead a patient to believe that hospital staff would actively set out to acquire incriminating evidence, which again is not the fact situation in this case with respect to the second blood sample and test.

8. There is no indication in this case that Hannoy did not consent to the medical treatment provided by Community North Hospital. Additionally, such consent, in order to be valid, would not require a hospital to inform the patient that any toxicological test results might be turned over to law enforcement. *Cf. Hayes v. State*, 667 N.E.2d 222, 225–26 (Ind. Ct.App.1996), *trans. denied* (holding therapist is not required to advise patient of mandatory child abuse reporting statute before counseling patient).

We do not want to be misunderstood as holding that Indiana Code Section 9–30–6–6(a) authorizes the release of toxicological test results or bodily fluid samples to law enforcement anytime it is requested in relation to any criminal investigation. We do not believe Section 9–30–6–6 authorizes broad "fishing expeditions" by law enforcement searching for evidence that some person has committed some crime. First, the placement of Section 9–30–6–6 in the Traffic Code clearly indicates that it applies only to criminal investigations concerning operating while intoxicated and its related crimes. Second, Hannoy was one of two drivers involved in a fatal motor vehicle accident, and we assume that law enforcement officers will limit their requests for toxicological test results specifically to drivers who have been hospitalized following an accident rather than requesting test results from patients at random for no reason whatsoever. This makes the request reasonable under the Fourth Amendment. *Cf. Oman*, 737 N.E.2d at 1147–48 (holding investigative subpoena issued by prosecutor to obtain toxicological test results of firefighter involved in traffic accident was reasonable under the Fourth Amendment, although probable cause was lacking, where it was sufficiently limited in scope in that it only sought that firefighter's test results, specific in directive in that only sought test results from a specific date, and was relevant in purpose to valid criminal investigation instigated "first and foremost" by the fact of the accident and by anonymous tip that firefighter had tested positive for marijuana). Therefore, the blood alcohol test results that law enforcement obtained from Community North

Hospital may be admitted in the event Hannoy is retried.[9]

We are keenly aware that our holding in Part II of this opinion may render Part I practically ineffectual in many instances. We assume, in the case of an automobile accident that requires the hospitalization of a driver, that most if not all hospitals will perform a toxicological screening of the driver as part of their routine treatment protocol. Thus, it is true that in many instances, where police lack probable cause or actual consent to obtain directly a driver's blood for toxicological testing, they will be able to indirectly obtain such test results. Nevertheless, *Schmerber* and *Ferguson* are both equally clear: police themselves may forcibly obtain a blood sample from a driver for toxicological testing without a warrant or consent, but only when they have probable cause that a driver was intoxicated. They may not work surreptitiously with hospital personnel to obtain samples or test results in the absence of individualized suspicion or actual consent to a law enforcement search. They may, however, acquire test results that medical personnel have obtained during the normal course of treatment. We are required to follow the Supreme Court's definitions of the Fourth Amendment's boundaries, even if doing so leads to some evidence being suppressed and virtually identical alternative evidence not being suppressed, depending upon how it was obtained.

## Conclusion

The trial court erred in admitting blood alcohol test results from a blood sample obtained from Hannoy by law enforcement

---

9. Hannoy also argues that the State improperly obtained not only his toxicological test results, but his entire medical file without first obtaining a court order. To the extent that appears to be the case, Indiana Code Section 9–30–6–6 does not authorize such a broad release of information, and we do not condone such action by the State. However, it does not appear that any evidence from Hannoy's medical file, aside from the hospital's toxicological test results, was used against Hannoy at trial.

where there was no compliance with the implied consent law, no probable cause when the sample was taken that Hannoy was intoxicated, and no actual consent to the taking and testing by Hannoy. Additionally, we cannot say the introduction of these test results constituted harmless error. We must reverse Hannoy's convictions, although he may stand trial again. On remand, the blood alcohol test results from the sample obtained and tested by Community North Hospital for its own diagnostic purposes and later released to law enforcement may be admitted at trial.

Reversed and remanded.

RILEY, J., and SHARPNACK, J., concur.