Michael R. WIGGINS, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 43A03–0312–CR–498.

Court of Appeals of Indiana.

Nov. 17, 2004.

Michael W. Reed, Reed & Earhart Attorneys at Law, P.C., Warsaw, IN, for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, for Appellee.

## OPINION

MATHIAS, Judge.[1]

Michael Wiggins ("Wiggins") was convicted of Class C felony operating while intoxicated causing death[2] and Class D felony operating while intoxicated causing serious bodily injury[3] in Kosciusko Superior Court. Wiggins appeals and raises the following dispositive issue, which we restate as: Whether the trial court abused its discretion when it admitted the results of Wiggins' urine toxicology test into evidence. Concluding that the investigating police officer did not have probable cause to believe that Wiggins was intoxicated when he ordered the test, we reverse.

### Facts and Procedural History

On August 4, 2002, at approximately 1:45 p.m., Wiggins, driving northbound on State Road 13 in North Webster, Indiana, slowed and began to make a left-hand turn into a gas station. As Wiggins turned left and began to cross the southbound lane, he struck a motorcycle driven by Terry Wilson ("Terry"). Terry's eleven-year old nephew, D.W., was a passenger on the motorcycle. Both Terry and D.W. were thrown from the motorcycle during the collision. Terry suffered serious head injuries as a result of the accident and died later that same day. D.W. suffered serious injuries to his left leg and thigh. Wiggins injured his left wrist in the accident.

Kosciusko County Sheriff's Deputy Jon Tyler ("Deputy Tyler") responded to the accident scene. While speaking with Wiggins, Deputy Tyler did not observe any physical signs of intoxication, but had difficulty ascertaining Wiggins' physical condi-

tion because he was receiving medical treatment at the time. Deputy Tyler requested Wiggins' license, which Wiggins removed from his wallet and gave to Tyler. Deputy Tyler also retrieved Wiggins' vehicle registration from his car. There was a discrepancy between the addresses on Wiggins' license . and registration, and therefore, Deputy Tyler asked Wiggins which address was correct. Tr. p. 15. Deputy Tyler noted that Wiggins "had some confusion as to which one was correct." *Id.* When questioned about the accident, Wiggins told Deputy Tyler that he did not see the motorcycle and it "must have come off the side street." Tr. p. 18.

Wiggins was then taken to Kosciusko Community Hospital for medical treatment. Without requesting permission or advising Wiggins in any way and without claiming on a hospital request form that he had probable cause to do so, Deputy Tyler asked the hospital staff to obtain blood and urine samples from Wiggins, and the Kosciusko Community Hospital staff complied. The standard operating procedure of the Sheriff's Department at that time was to request a blood draw from any driver involved in an accident resulting in death or serious bodily injury. Tests performed on Wiggins' urine revealed a positive result for marijuana metabolites.

On November 20, 2002, Wiggins was charged with two counts of Class C felony operating while intoxicated causing death, two counts of Class D felony operating while intoxicated causing serious bodily injury and one count of Class D felony criminal recklessness causing serious bodily in-

---

1. We heard oral argument in this case in Fort Wayne, Indiana at Concordia High School on October 21, 2004. We extend our appreciation to the students, faculty, and staff for their interest and hospitality and to counsel for the high quality of their written and oral presentations.

2. Ind.Code § 9–30–5–5(a)(2) (1992 & Supp. 2003).

3. Ind.Code § 9–30–5–4(a)(2) (1992 & Supp. 2003).

jury.[4] On October 15, 2003, Wiggins filed a motion to suppress the results of the urine toxicology test

> on the basis that the specimens in question were taken from the defendant without his consent, that the specimens were taken from the defendant, on the state's instructions, without probable cause, that the specimens were not taken in accordance with Indiana statutes, and that pursuant to the 4th Amendment of the United States Constitution, the non-consensual taking of such specimen from a defendant, without either warrant or probable cause, constitutes an illegal and unconstitutional search [of] the defendant herein.

Appellant's App. p. 26. The trial court denied Wiggins' motion and also denied his motion to certify the trial court's ruling for interlocutory appeal.

A jury trial commenced on November 5, 2003. The State proceeded to trial on Counts I and III, which alleged that Wiggins operated a motor vehicle with a schedule I or II controlled substance or its metabolite in his body causing the death of Terry Wilson (Count I) and causing serious bodily injury to D.W. (Count III). Appellant's App. p. 12. The remaining counts were dismissed on the State's own motion. At trial, Wiggins renewed his objection to the admission of the results of his urine toxicology test, but his objection was overruled.

The jury found Wiggins guilty on both counts, and on December 1, 2003, the sentencing hearing was held. Wiggins was sentenced to serve consecutive terms of eight years for his Class C felony operating while intoxicated causing death conviction and three years for his Class D felony operating while intoxicated causing serious bodily injury conviction. The trial court also ordered Wiggins' driver's license and driving privileges suspended for two consecutive terms of five years.[5] Wiggins now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

■■■ Wiggins argues that the trial court abused its discretion when it admitted the results of his urine toxicology test into evidence. "The evidentiary rulings of a trial court are afforded great deference and are reversed on appeal only upon a showing of an abuse of discretion." *Reynolds v. State*, 797 N.E.2d 864, 867 (Ind.Ct. App.2003). An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Pickens v. State*, 764 N.E.2d 295, 297 (Ind.Ct.App.2002), *trans. denied.*

■■■ Additionally, the trial court entered findings of fact and conclusions of law when it denied Wiggins' motion to suppress, and during trial, the court overruled Wiggins' objection to the admission

---

4. The State charged Wiggins with operating while intoxicated causing death under Indiana Code sections 9–30–5(a)(2) and (a)(3). Those sections provide: "(a) A person who causes the death of another person when operating a motor vehicle: ... (2) with a controlled substance listed in schedule I or II of IC 35–48–2 or its metabolite in the person's body; or (3) while intoxicated; commits a Class C felony." Similarly, the State charged Wiggins with operating while intoxicated causing serious bodily injury under Indiana Code sections 9–30–5–4(a)(2) and (a)(3).

5. We also note that at sentencing, Wiggins requested a stay of his sentence pending appeal. The trial court denied his request but did not order him to report to the custody of the Sheriff until December 31, 2003. However, on the chronological case summary, the following entry dated December 31, 2003 appears: "The Court, on its own motion, ORDERS a stay of execution of sentence pending appeal due to recent Court of Appeals decisions." Appellant's App. p. 11.

of the test results "on the record that's previously been made." Tr. pp. 283–84. When we review a decision entered with findings and conclusions, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Hannoy v. State,* 789 N.E.2d 977, 981 (Ind.Ct.App.2003), *aff'd on reh'g, trans. denied.* Findings of fact are clearly erroneous only when the record lacks any evidence to support them. *Id.*

▇ The Fourth Amendment generally prohibits warrantless searches and seizures. *Id.* at 982. "Searches conducted without a warrant are per se unreasonable subject to a few well-delineated exceptions." *Id.* When a search is conducted without a warrant, the State bears the burden of proving that an exception to the warrant requirement existed at the time of the search. *Id.*

▇ Indiana Code chapter 9–30–7 provides that persons who operate motor vehicles impliedly consent to submit to a portable breath test or chemical test as a condition of operating a vehicle in Indiana. *See* Ind.Code § 9–30–7–2 (1992 & Supp. 2003). However, there is no language in chapter 9–30–7 that authorizes an officer to forcibly take a blood sample if actual consent to a chemical test is not obtained. *See Hannoy,* 789 N.E.2d at 983. The chapter simply allows a police officer to offer a chemical test if there is evidence that a person operated a vehicle involved in an accident resulting in serious bodily injury or death and provides for civil penalties if the individual refuses to consent. *See id.; Duncan v. State,* 799 N.E.2d 538, 543 (Ind.Ct.App.2003).

▇ However, police officers may generally draw blood from a driver without warrant or consent if they have first developed probable cause to believe the driver

is intoxicated. *Hannoy,* 789 N.E.2d at 983 (citing *Schmerber v. California,* 384 U.S. 757, 769–70, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)). Nevertheless, they "exceed the bounds of *Schmerber* when they move from merely asking people to take a chemical test to compelling the insertion of a needle into their bodies without 'a clear indication' of intoxication." *Duncan,* 799 N.E.2d at 543 (citing *Schmerber,* 384 U.S. at 770, 86 S.Ct. 1826). More specifically,

It is acceptable for police to draw a person's blood without their consent if (1) there is probable cause to believe that the person has operated a vehicle while intoxicated; (2) the dissipation of alcohol in the blood creates exigent circumstances under which there is no time to secure a search warrant; (3) the test chosen to measure the person's blood alcohol concentration is a reasonable one; and (4) the test is performed in a reasonable manner. However, these standards are the outer limits of what constitutes acceptable police conduct in taking blood samples from unwilling people. In addition, the Supreme Court [in *Schmerber*] noted that the interests in human dignity and privacy protected by [the] Fourth Amendment forbid police from making any such intrusions on the mere chance that desired evidence might be obtained. Specifically, the Court stated, "In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search."

*Duncan,* 799 N.E.2d at 542–43 (internal citations omitted).

In *Duncan,* although the defendant refused to submit to a chemical test, his blood was drawn and the test results revealed a blood alcohol content of .106. *Id.* at 541. He moved to suppress the test

results, and his motion was denied. *Id.* at 542. On appeal, our court concluded that the police officer did not establish probable cause because the officer failed to clearly indicate why he thought the defendant was intoxicated. *Id.* at 543. We observed:

> Even when the trial court specifically asked him to describe his observations, [Detective] Roney merely said he "determined that due to Mr. Duncan's speech and mannerisms that he was intoxicated." In addition, Roney indicated on the affidavit for probable cause that his sole basis for believing Duncan was intoxicated was that he saw "[a]lcohol beverage containers in view."

*Id.* at 543–44 (record citations omitted). Accordingly, we held that the police officer's testimony was insufficient to establish probable cause to compel the defendant to submit to a blood draw. *Id.* at 544.

More recently, in *Schlesinger v. State,* 811 N.E.2d 964, 966 (Ind.Ct.App.2004), *trans. denied,* the appellant argued that the trial court abused its discretion when it admitted the results of a toxicology blood test because the test was obtained without a warrant and was not necessary for the defendant's medical care. Like Wiggins, Schlesinger argued that the police officer did not have probable cause that his blood would contain evidence of alcohol or illegal substances. *Id.* at 967. The police officer was aware that Schlesinger had consumed alcoholic beverages earlier in the evening, however, after the accident, Schlesinger performed correctly on each of the field sobriety tests administered. *Id.* Moreover, the police officer's actions demonstrated that he did not believe he had probable cause to obtain the blood sample. In completing the hospital form for release

of the blood sample, the officer did not indicate on the form that he believed he had probable cause where he was asked to check a box to indicate why the sample was obtained. *Id.* Therefore, we concluded that the police officer lacked probable cause to order the blood draw. *Id.* After also holding that Schlesinger did not consent to the blood draw and that the blood alcohol content test was not performed for medical reasons, we reversed his conviction. *Id.* at 968.

In this case, Deputy Tyler did not properly attain Wiggins' consent to a portable breath test or chemical test under Indiana's Implied Consent Law and did not even seek Wiggins' consent before ordering the urine test. We also observe that on a hospital form entitled "Forensic Drug Testing Custody and Control Form," under the section titled "Reason for the Test," only the box for "post accident" was checked; the box for "reasonable suspicion/cause" was not marked.[6] Ex. Vol., State's Exs. 4 and 7. At the hearing on the motion to suppress,[7] Deputy Tyler testified that at the time of the accident, it was the standard policy of the Sheriff's Department to require a blood and/or urine sample in all accidents involving serious bodily injury or death. Tr. p. 22. He also stated that his request for Wiggins' blood and urine samples was based on a "combination" of both probable cause and the standard operating procedure of the department. Tr. p. 9.

When asked to identify each factor used to determine probable cause that Wiggins was intoxicated, Deputy Tyler responded:

> I would start with the driving behavior prior to the crash. Where he made a

---

**6.** It is unclear whether Deputy Tyler or a hospital employee filled out this portion of the form.

**7.** At trial, Wiggins renewed his objection to the admissibility of the test results and moved to incorporate his argument from the hearing on the motion to suppress. Tr. pp. 283–84.

left turn in front of a vehicle and failed to yield the right of way. Then when attempting to clarify something like his address and where he lived, there was some confusion as to what his address was. And when there were two conflicting documents, there was a difficulty determining which one's correct. I seem to recall there was some difficulty in answering the questions as to who his insurance carrier was at the time. I asked him if it was the same one on his insurance ... registration and he had some confusion as to who that would be. There was [sic] some statements as to what actually occurred at the crash. Whether he saw the motorcycle beforehand or if it came off a side street.

Tr. pp. 19–20. However, Deputy Tyler also stated that he did not observe any physical signs of intoxication. Tr. pp. 7–8. We also note that during Deputy Tyler's questioning of Wiggins, Wiggins was being treated by medical personnel. Tr. p. 8 ("It was difficult to determine exactly what [Wiggins'] state was because he was being restrained at the hospital, according to their procedures, when he was laying [sic] on the board being attended to. And at the scene he was being attended to by medical personnel.").

With regard to Wiggins' confusion over his address, during cross-examination of Deputy Tyler, the following exchange occurred:

DEFENSE COUNSEL: Okay. Once he got his driver's license out what did you do?

TYLER: I had already, I believe, I'd already obtained his registration from his vehicle. There was a discrepancy on the two. One had a physical address on his license and I believe it was a PO box on the registration. I attempted to clarify which was correct or if they were both correct and just asked him a direct question, which is your current address? [W]here do you live?

DEFENSE COUNSEL: And what did he tell you?

TYLER: He had some confusion as to which one was correct. It was determined that it was the North Webster address that was the correct one.

DEFENSE COUNSEL: Did you ... When you asked that question, did you give him a choice or did you merely ask him what his address was?

TYLER: Well, I had both documents and I said, which is correct? Gave him ... Which is the current address? Where do you live?

DEFENSE COUNSEL: Did you say, your driver's license says this and your registration says this or did you say, your driver's license says one address and registration says another, without specifying the address where he lived?

TYLER: I believe I said, that there were two addresses and I would like to know which one was the correct one.

Tr. pp. 14–15.

Deputy Tyler also gave the following testimony concerning Wiggins' statements regarding the accident:

TYLER: I'd asked him what had happened in the crash. He told me that he didn't see the motorcycle. And then a few sentences later he made the comment that he thought he came off a side street. So there was some confusion in the statements about the actual occurrences that led up to the crash.

* * *

TYLER: Initially he said that he didn't see the motorcycle. And then later he said, he thought maybe it came off a side street.

DEFENSE COUNSEL: Was he saying that in a definitive way or was it in a speculative way?

TYLER: I think he was more definitive than trying to explain. It was more to the fact that it, this might not be his exact words but, it must have come off the side street. It was more definitive than a hypothetical explanation of where the motorcycle came from.

Tr. pp. 17–18.

Finally, with regard to testimony concerning Wiggins' confusion over his insurance carrier, the following exchange occurred:

TYLER: As I recall I was crouched down next to him and had both the document[s] in my hand and I . . . is this insurance carrier, correct? And it is my common practice to have that in my hand and that's the first indication that I have an insurance carrier. Is this correct? Is State Farm your insurance carrier? I think that was in this case.

DEFENSE COUNSEL: And he was confused as far as what?

TYLER: He could not, I don't believe, he gave me a definitive answer. It was kind of like, his response was not definitive. It wasn't, yeah that's the correct one, no that's it, it's changed to, whatever the insurance company would be. I think . . .

DEFENSE COUSNEL: Was it, I don't know or I can't say?

TYLER: I don't know if I ever got a yes it's this one or no it's not this carrier.

DEFENSE COUNSEL: So . . .

TYLER: My recollection tells me that the answer ended up being, whatever's on there is correct. And we went with that one being correct.

Tr. pp. 20–21.

Upon review of Deputy Tyler's testimony, it is clear that Wiggins had some difficulty answering Tyler's questions following the accident while he was being treated at the scene and in the emergency room by medical personnel. But, without some objectively observed clear indication of intoxication, such as dilated pupils, telltale odor or failed field sobriety test(s), under Indiana's Implied Consent Law, Wiggins' difficulty in answering Deputy Tyler's questions under these circumstances is not significant enough, by itself, to provide the probable cause required for the blood and urine tests ordered by Tyler under *Duncan* and *Schmerber.* Deputy Tyler therefore lacked the probable cause necessary to compel Wiggins to submit to a blood draw and urine test, and we conclude that the urine toxicology test results should not have been admitted into evidence at trial.

Finally, we observe that pursuant to Indiana Code section 9–30–6–6(a), a physician or other person who has obtained the results of a chemical test on a person's blood or urine is required to deliver the results or the sample itself to a law enforcement officer who requests them as part of a criminal investigation. *See Hannoy,* 789 N.E.2d at 990; Ind.Code § 9–30–6–6(a) (1992 & Supp.2003). In *Hannoy,* our court held that under section 9–30–6–6(a) law enforcement officers may acquire test results that medical personnel have obtained during the normal course of treatment. *Id.* at 991–92 ("To the extent Hannoy does have an expectation of privacy in his medical records generally, we conclude that in Indiana at least, society does not recognize a reasonable expectation of privacy in blood alcohol test results obtained and recorded by a hospital as part of its consensual treatment of a pa-

tient, where those results are requested by law enforcement for law enforcement purposes only in the investigation of an automobile accident.").[8]

In this case, in its findings of fact and conclusions of law, the trial court denied Wiggins' motion to suppress "in regard to the test results obtained by medical personnel where the tests were performed for purposes of diagnosis and treatment." Appellant's App. p. 30. Importantly, however, there is no evidence in the record that any tests results revealing the presence of marijuana metabolites in Wiggins' body were performed for the purpose of either diagnosis or treatment. The trial court's finding is therefore clearly erroneous. *See Hannoy,* 789 N.E.2d at 981 ("Findings of fact are clearly erroneous only when the record lacks any evidence to support them."). Furthermore, the State only argues that Deputy Tyler had probable cause to believe that Wiggins was intoxicated and does not contend that Wiggins' urine toxicology test results were obtained during the normal course of medical treatment.

Finally, we must determine whether the admission of Wiggins' urine toxicology test results was harmless error. "Where evidentiary error has occurred, reversal is not required if it is apparent that the fact finder did not rely upon the improper evidence in reaching the verdict." *Hannoy,* 789 N.E.2d at 989. We must consider the probable impact of the evidence upon the fact finder when we determine whether improper evidence was relied upon in reaching the verdict. *Id.* Our court may conclude that the fact finder did

not rely upon improper evidence where there was other overwhelming evidence of guilt. *Id.*

In this case, the urine toxicology test was the only evidence admitted which established that Wiggins operated a motor vehicle with a controlled substance or its metabolite in his body causing the death of Terry Wilson and serious bodily injury to D.W. Accordingly, we cannot conclude that the erroneous admission of the urine toxicology test results was harmless and we must therefore reverse Wiggins' convictions.

Reversed.

BARNES, J., and CRONE, J., concur.

8. In the opinion on rehearing, our court also observed that "there is a clear and substantial difference between allowing police to force a person to submit to having his or her blood withdrawn to look for evidence of a crime, in which case probable cause or actual consent must first be obtained, and police receiving blood test results after-the-fact when the results were obtained by a physician as part of the person's medical treatment." *Hannoy v. State,* 793 N.E.2d 1109, 1111 (Ind.Ct.App. 2003).