## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 14 2015, 9:37 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

William J. Cohen
Cohen Law Offices
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Bucky Willard Kado and Amanda Dankert, *Appellants-Defendants,* v. State of Indiana, *Appellee-Plaintiff* | October 14, 2015 |
| | Court of Appeals Case No. 20A05-1502-CR-73 |
| | Appeal from the Elkhart Superior Court |
| | The Honorable Charles C. Wicks, Judge |
| | Trial Court Cause Nos. 20D05-1307-FD-790 20D05-1307-FD-805 |

**Baker, Judge.**

[1] Bucky Kado and Amanda Dankert (collectively, the Appellants) appeal their convictions for Class D Felony Possession of Marijuana[1] and Class A Misdemeanor Possession of Paraphernalia.[2] They argue that the trial court abused its discretion when it determined that the Appellants consented to a search of their house and when it denied their motion to suppress. Finding that the trial court did not abuse its discretion, we affirm.

## Facts

[2] At some time prior to May 30, 2013, State Trooper Brian Hoffman observed Dankert purchasing items at the Five Point Gardens store in South Bend, Indiana. Based on his knowledge of the store and the items sold there, this was "enough to give [him] a little suspicion[.]" Tr. p. 20. He subpoenaed power records of the Appellants' house and found the usage to be much higher than his own house, despite the Appellants' house being smaller. He also received an anonymous tip that marijuana was being grown at the house.

[3] Based on this information, on May 30, 2013, Trooper Hoffman and Detective Andy Whitmyer conducted a "knock and talk"[3] at the Appellants' home in order to ask them whether they were growing marijuana. As Kado opened the door, Trooper Hoffman and Detective Whitmyer noticed a strong odor of

---

[1] Ind. Code § 35-48-4-11(1).

[2] I.C. § 35-48-4-8.3(a)(1) and (b).

[3] *See Hardister v. State*, 849 N.E.2d 563, 570 (Ind. 2006) (explaining the "knock and talk" procedure).

marijuana. Trooper Hoffman told Kado that the officers were there to discuss the grow operation. According to Trooper Hoffman, Kado engaged them in "a very cordial conversation," tr. p. 37, and invited the officers into the house. After waking up Dankert, Trooper Hoffman asked the Appellants for their consent to search the premises. Trooper Hoffman read a consent to search form "line-for-line," standing next to Kado so that Kado could read along. Tr. p. 51. Among other things, the form lists the individual's right to speak with a lawyer before giving consent to search. Defs.' Ex. B. The officers allowed Dankert to call friends to obtain their advice, but she did not attempt to call an attorney. Both Appellants signed the consent to search form. *Id.*

[4] After both Appellants signed the form, Kado began showing the officers around the house. He showed Trooper Hoffman jars of marijuana above the washer and dryer. He then revealed a hatch—hidden under a rug, which was under a table—that led to the basement grow operation. In the basement were thirty marijuana plants. In total, police collected 1,114 grams of marijuana from the Appellants' house.

[5] After the initial walkthrough, Trooper Hoffman provided the Appellants with an advice of rights form that listed Defendants' Miranda[4] rights. Again, Trooper Hoffman read through the form line by line. Both Appellants signed the form, agreeing to waive their Miranda rights. Defs.' Ex. C.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6]     On July 30, 2013, the State charged Kado with class D felony possession of marijuana and class A misdemeanor possession of paraphernalia. The following day, it charged Dankert with the same. On January 30, 2014, the Appellants filed a motion to suppress regarding the evidence obtained at the house. The Appellants challenged the officers' account of the interaction. In their motion, they contended that "Kado asked the officers if they had a warrant and they stated no," and then "Kado told them they could not come in." Appellants' App. at 28. They further contended that Kado turned his head away from the officers and when he did so, "the officers entered the residence without the defendants' consent or permission," and proceeded to search the residence. *Id.* at 29. As for the consent to search form, Appellants stated, "Only after the search, did the officers asked [sic] the defendants if they would sign a consent for the search." *Id.* Finally, they alleged that "[b]efore signing anything, defendants asked the officers for a lawyer and the officers told them they did not need one." *Id.*

[7]     In addition to these two diametrically opposed accounts, the trial court listened to an audio recording. State's Ex. 3. The recording is eight and a half minutes in duration, was recorded after the search had been completed, and does not capture what the officers said to Kado at the front door. Later, when asked at trial why he did not record the entire interaction, Trooper Hoffman testified, "I don't know if I had it with me or if it just didn't turn on or—honestly, the way I keep it in my—my little booklet that I carry to the doors, if it got bumped . . . But I can tell you that it was not functioning." Tr. p. 46. The recording

features Trooper Hoffman having a calm conversation with Dankert. In the recording, Trooper Hoffman reconstructs what had happened so far:

> So I knocked on the door, and uh, eventually [Kado] came to the door and we identified ourselves, explained to him what we were doing . . . So he invited us in, we came in, explained to you further what's going on, read the consent to search with you, correct? . . . You agreed to all that, signed it. And then [Kado] took me down, showed me the grow areas . . . Then I read you the advice of rights, you're good there, signed that. And basically we started talking to you about what's going on and filling you in, the cooperation and all that.

State's Ex. 3. Although this account was essentially a monologue without Dankert's explicit affirmation, Dankert did not disagree with the account and continued conversing with the officer. Following a hearing, the trial court denied the motion, concluding that the Appellants consented to the search: "listening to the audio tape, the court cannot conclude anything but that the defendants were patiently explained their rights and that the conversation was cordial as the officer described." Appellants' App. at 67.

[8] On October 27, 2014, a bench trial was held and the trial court found the Appellants guilty. It sentenced Kado to 540 days at the Indiana Department of Correction, with 539 days suspended; a $1,500 fine, with $1,200 suspended; a $200 interdiction fee; and one year at the County Jail, with 364 days suspended. Dankert received the same sentence, but with both incarceration terms completely suspended. The Appellants now appeal.

## Discussion and Decision

[9] The Appellants argue that the trial court erred in admitting the evidence obtained at the house. A trial court has broad discretion in ruling on the admissibility of evidence, and we will only disturb a trial court's ruling upon a showing of an abuse of discretion. *State v. Lloyd*, 800 N.E.2d 196, 198 (Ind. Ct. App. 2003). An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the appellant's favor. *Id.* We conduct a de novo review of a trial court's ruling on the constitutionality of a search or seizure. *Belvedere v. State*, 889 N.E.2d 286, 287 (Ind. 2008).

[10] The Appellants make claims under both the United States and Indiana Constitutions. Both Constitutions protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV; Ind. Const. art. I, § 11. As our Supreme Court has made clear, "Many search and seizure issues are resolved in the same manner under both the Indiana and Federal Constitutions." *Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008). Two such issues are the warrant requirement and the exceptions to that requirement. *Id.* at 596-600. Therefore, we will address the claims under both Constitutions simultaneously.

[11]     While searches conducted without a warrant are generally prohibited, there are a few well-delineated exceptions to the warrant requirement. *Peel v. State*, 868 N.E.2d 569, 574-75 (Ind. Ct. App. 2007). One exception obtains when consent is given to the search. *Id.* at 575. When the State relies upon consent to justify a warrantless search, it has the burden of proving that the consent was freely and voluntarily given. *Hannoy v. State*, 789 N.E.2d 977, 988 (Ind. Ct. App. 2003)

[12]     The Appellants argue that since the State has the burden of proof to show a valid consent, "[w]here the police failed to record the conversation at the doorstep, and there is a dispute on consent to enter, then the State failed to prove consent to enter." Appellants' Br. 4. This is an incorrect statement of law; the State is not required to prove consent by an audio recording. This argument, in effect, asks us to invalidate every consent to search that was not captured on tape. We decline to do so.

[13]     This is not a case involving an agreed-upon set of facts giving rise to an ambiguous consent. In such a case, it would be appropriate to weigh several factors to determine whether consent was given voluntarily. *See Meyers v. State*, 790 N.E.2d 169, 172 (Ind. Ct. App. 2003) (listing seven factors used to determine whether a consent was voluntary). Rather, this case involves two unambiguous, but diametrically opposed, accounts. Clearly, if the Appellants' account is true—that they asked the officers to produce a warrant; that the officers barged in without invitation; that the officers refused to leave when the Appellants requested an attorney—then there was not consent to search and the

search would be invalid. A subsequent signature on the consent to search form would not cure such a search of invalidity. *Ware v. State*, 782 N.E.2d 478, 482-83 (Ind. Ct. App. 2003). But if the officers' account is true—that they asked permission to enter; that Kado cordially invited them in; that they read the consent to search form, which the Defendants signed; that the officers searched the house after obtaining the signatures; that they read the advice of rights form, which the Defendants signed—then there was consent to search and the search would be valid.

[14] Our standard of review makes clear that the determination of which account to believe is within the trial court's discretion, not ours. In making this determination, the trial court was not limited to uncorroborated testimony. In addition, the trial court considered the signed consent to search form, the signed advice of rights form, and the audio recording. After considering the evidence, the trial court determined, "The audio tape is an objective piece of evidence which substantially corroborates Trooper Hoffman's version of the events of May 30, 2013, and effectively refutes defendant's [sic] assertion that they were threatened or intimidated into signing the requisite consent and waiver forms." Appellants' App. at 68.

[15] The trial court countenanced the Defendants' account, admitting the possibility that Trooper Hoffman was a "very slick operator," *id.*, who violated the Appellants' rights, made nice while in the house, and then created an audio tape of a cordial conversation to cover his trail. But having admitted the possibility, the trial court found "that the State of Indiana's version of the facts

is more compelling than that of the defendants[.]" *Id.*[5] This is the trial court's prerogative, and we cannot say it abused its discretion in making this determination. Thus, because there was a valid consent to search the house, the Appellants' Constitutional rights were not violated and their motion to suppress was properly denied.

[16] The judgment of the trial court is affirmed.

Bailey, J., and Mathias, J., concur.

---

[5] The trial court also stated in its order that "[t]he court has no way of determining whether the search occurred before or after the consent to search was signed." App. at 67. By this, we understand the trial court not to be speaking literally, but rather to be commenting on its inability to know with certainty what took place at the home. If understood literally, the statement would be contradicted by its later statement finding the officer's account more credible.