## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 16 2016, 8:47 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Daniel Dixon
Lawrence County Public Defender
Agency
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kyle Hutton,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 16, 2016

Court of Appeals Case No.
47A04-1503-CR-117

Appeal from the Lawrence
Superior Court

The Honorable Michael A.
Robbins, Judge

Trial Court Cause No.
47D01-1212-FB-1425

**Crone, Judge.**

# Case Summary

Kyle Hutton appeals his convictions and sentence for three counts of class B felony causing death when operating a motor vehicle with an alcohol concentration equivalent ("ACE") of 0.15 or more. Hutton asserts that the trial court abused its discretion by refusing his tendered instruction on the lesser-included offense of class A misdemeanor operating a vehicle with an ACE of 0.15 or more. Hutton also contends that the trial court abused its discretion by refusing his tendered instruction on intervening cause. Hutton further challenges the trial court's decision to admit, over his objections, the results of his two blood draws. Finally, he argues that his forty-two-year aggregate sentence is inappropriate based on the nature of the offenses and his character.

We conclude that the trial court did not abuse its discretion by refusing Hutton's tendered instructions. We also conclude that the trial court properly admitted the results of his first blood draw and any error in admitting the second blood draw was harmless. Finally, we conclude that Hutton failed to carry his burden to show that his sentence is inappropriate. Therefore, we affirm.

# Facts and Procedural History

In July 2012, Hutton spent the day drinking alcohol with his wife, Morgan Hutton, and their two friends, Dasan Spires and Laura Duncan, at Lake Monroe. Later that day, the four drove in Hutton's Jeep to a brewery, where

Hutton continued to drink. They stayed two or three hours. Around 10:10 p.m., the four left in Hutton's Jeep, with Hutton driving. No one put on a seatbelt. A friend offered to drive the entire group in her vehicle, but Hutton refused, saying that he did not want to leave his Jeep at the brewery.

[4] Hutton drove toward his house. Around 10:30 p.m., the Jeep swerved to the left, went down an embankment, and struck a telephone pole. All four people were thrown from the Jeep. All three passengers died at the scene. Hutton got up and walked to his home, which would have taken approximately six minutes. He passed eight houses, but he did not stop at any of them. When he arrived home, he delayed calling 911 because he was scared. Around 10:59 p.m., Hutton called 911.

[5] Officers responded to the scene of the accident. Officers noted that the Jeep's driver's seat was in its rearmost position. Hutton is about six feet three inches tall, whereas Morgan was only five feet five inches tall.

[6] According to a later accident reconstruction, Hutton drove through a right-hand curve going approximately forty-eight miles per hour (in a thirty-miles-per-hour zone), which was too fast to take the curve. Tr. at 1917. The accident reconstruction showed that Hutton abruptly steered left and lost control of the Jeep. It also revealed that Hutton partially applied his brakes before the collision, but he still hit the telephone pole at thirty-one miles per hour.

[7] Bedford Police Officer Morgan Lee was dispatched from the accident scene to Hutton's home. Hutton was standing in the yard when Officer Lee arrived.

Officer Lee smelled alcohol emanating from Hutton's breath and body and observed that Hutton's eyes were bloodshot and glassy. Officer Lee also noticed that Hutton had difficulty walking and was slurring his speech. Officer Lee called for an ambulance because Hutton was in pain and was having trouble breathing. Officer Lee's experience with automotive accidents led him to believe that Hutton likely had suffered some chest injury from striking the steering wheel.

[8] While waiting for the ambulance, Officer Lee twice asked Hutton if he had been the driver of the Jeep, but Hutton only replied, "Come on man." *Id*. at 833, 837. When the ambulance arrived, paramedic Michael Bierbaum provided medical care to Hutton. Hutton told Bierbaum that he had been in a crash and that he thought that everyone else was dead. Bierbaum wrote in his report that Hutton was driving the Jeep when it crashed. Although Bierbaum did not independently recall Hutton telling him that, Bierbaum testified that since it was in his report he assumed that Hutton had told him. *Id*. at 1006. The paramedics took Hutton to Indiana University Health Bedford Hospital ("Bedford Hospital"), with Officer Lee following.

[9] At Bedford Hospital, Officer Lee advised Hutton of Indiana's implied consent law in the presence of Nurse Debra Potter. Hutton said, "[W]hatever," and stuck out his arm. *Id*. at 838-39. Nurse Potter drew Hutton's blood for the forensic chemical test. Blood testing subsequently showed that at the time of the blood draw Hutton's ACE was 0.27. *Id*. at 1434. Based on the calculations

at the Indiana State Department of Toxicology, at the time of the accident Hutton's ACE was between 0.28 and 0.3. *Id*. at 1434, 1436.

[10] At 11:55 p.m., Hutton was transported by helicopter to Indiana University Health Methodist Hospital ("Methodist Hospital") in Indianapolis. Nurse Joseph Gibbs treated Hutton in the helicopter. Nurse Gibbs observed that Hutton appeared to be intoxicated. Hutton asked Gibbs repeatedly, "Did I kill my wife?" *Id*. at 1052-53.

[11] At Methodist Hospital, Nurse Jamie Jackson performed a blood draw on Hutton as part of the hospital's standard medical care. *Id*. at 1189. The blood test indicated that Hutton's ACE was still between 0.22 and 0.27. *Id*. at 1439-40; Exs. 62-63. Hutton's injuries were consistent with striking the steering wheel while driving the Jeep during the collision. *Id*. at 1946-47.

[12] The State charged Hutton with three counts of class B felony causing death when operating a motor vehicle with an ACE of 0.15 or more. Hutton filed a motion to suppress the results from the Bedford Hospital blood draw, which the trial court denied. At the jury trial, the State introduced the results of the blood draws from Bedford and Methodist Hospitals. Hutton objected to both blood draws on the basis that the State failed to lay a proper evidentiary foundation that the blood draws were conducted under the direction of a physician or under a physician-prepared protocol. The trial court admitted the results of both blood draws. Hutton testified that his wife was driving the Jeep and that he was in the back seat when the accident occurred. At the conclusion of

evidence, Hutton tendered an instruction on the lesser-included offense of class A misdemeanor operating a motor vehicle with an ACE of 0.15 or more. He also tendered an instruction on intervening cause. The trial court declined to give either instruction.

[13] The jury found Hutton guilty as charged. The trial court sentenced Hutton to consecutive terms of fourteen years on each count, for an aggregate term of forty-two years, with two years suspended to probation. This appeal ensued.

## Discussion and Decision

## Section 1 – The trial court did not abuse its discretion by refusing Hutton's tendered instruction on a lesser-included offense.

[14] Hutton asserts that the trial court abused its discretion by refusing his tendered instruction on the lesser-included offense of class A misdemeanor operating a vehicle with an ACE of 0.15 or more. "'The purpose of a jury instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict.'" *Williams v. State*, 891 N.E.2d 621, 630 (Ind. Ct. App. 2008) (quoting *Dill v. State*, 741 N.E.2d 1230, 1232 (Ind. 2001)). "Instruction of the jury is left to the sound judgment of the trial court and will not be disturbed absent an abuse of discretion." *Id.*

[15] We use a three-part analysis to determine whether an instruction on a lesser-included offense is appropriate. *Watts v. State*, 885 N.E.2d 1228, 1231-32 (Ind.

2008). First, the court determines whether the offense is an inherently lesser-included offense based on its elements. *Id.* If the lesser offense may be established by proof of all of the same or less than all of the same material elements of the crime, or if the only difference between the two offenses is that the lesser offense requires proof of a lesser culpability, then the lesser offense is inherently included in the crime charged. *Id.* Second, if the lesser offense is not inherently included, the court determines whether the lesser offense is factually included by the allegations in the charging information. Third, if the offense is either inherently or factually included, the court must examine the evidence presented by each party and determine whether there is a "serious evidentiary dispute" about the element or elements distinguishing the greater from the lesser offense, such that the jury could find that the lesser, but not the greater, offense was committed. *Id.*

[16] Hutton tendered an instruction defining class A misdemeanor operating a vehicle with an ACE of 0.15 or more and informing the jury that it was a lesser-included offense of class B felony causing death while operating a vehicle with an ACE of 0.15 or more. Appellant's App. at 441. The prosecutor objected to the instruction, and the parties engaged in a lengthy debate as to whether there was a serious evidentiary dispute regarding the element–causing death–that distinguished the lesser-included offense from the greater offense. Tr. at 2250-52. Ultimately, the trial court ruled as follows:

> The Court finds that the elements of the lesser offense are
> included in the crimes charged. The Court further determines

that there is [not[1]] a serious evidentiary dispute where by the jury could conclude the lesser offense is committed, but not greater charged offenses. And it is therefore the ruling of the Court [that] the lesser included offense instruction and verdict form will not be given.

*Id*. at 2351-52.

[17]    The parties agree that class A misdemeanor operating a vehicle with an ACE of 0.15 or more is an inherently-included offense of class B felony causing death when operating a vehicle with an ACE of 0.15 or more. They disagree on whether there was a serious evidentiary dispute on the distinguishing element of causing death. Hutton contends that there was conflicting evidence regarding the cause of the deaths because there was evidence that there was a deer in the road that caused the Jeep's driver to swerve. In support, Hutton cites to evidence that there were woods and apple trees in the vicinity of the accident. He also relies on Bedford Police Officer Robert Herr's testimony that it was "a possibility" that there was a deer or animal in the roadway. Tr. at 1633. Hutton further cites Lawrence County Sheriff Mike Branham's testimony that "'the abrupt steering input to the left,' … could be indicative of an avoidance

---

[1] Hutton argues that the trial court found that there *was* a serious evidentiary dispute because the transcript accurately reflects what the trial court said. We note that the parties argued at length as to whether there was a serious evidentiary dispute. During the discussion, the trial court appeared to be fully aware of the legal principle that if there is a serious evidentiary dispute on an element distinguishing the greater offense from the lesser-included offense, then the instruction for the lesser-included offense must be given. Moreover, "[w]e presume the trial judge is aware of and knows the law." *Conley v. State*, 972 N.E.2d 864, 873 (Ind. 2012). Therefore, since the trial court declined Hutton's instruction on the lesser-included offense, we presume that the trial court misspoke and meant to say that there was *not* a serious evidentiary dispute.

maneuver." Appellant's Br. at 11 (quoting Tr. at 1918 and citing Tr. at 1965). Sheriff Branham actually stated that he "couldn't rule out somebody engaging in an avoidance maneuver." Tr. at 1965. At best, the evidence Hutton relies on shows that it was possible that a deer was in the road, but whether there actually was a deer in the road remains pure speculation. "[S]peculation does not create a 'serious evidentiary dispute.'" *Allen v. State*, 686 N.E.2d 760, 777 (Ind. 1997), *cert. denied* (1999). We conclude that there was not a serious evidentiary dispute as to whether there was a deer in the roadway, and therefore the trial court did not abuse its discretion by refusing Hutton's instruction on the lesser-included offense.

## Section 2 – The trial court did not abuse its discretion by refusing Hutton's tendered instruction on intervening cause.

[18] Hutton contends that the trial court abused its discretion by refusing his tendered instruction on intervening cause. As noted above, jury instruction lies within the sound discretion of the trial court. *Burton v. State*, 978 N.E.2d 520, 524 (Ind. Ct. App. 2012). "A trial court erroneously refuses to give a tendered instruction, or part of a tendered instruction, if: (1) the instruction correctly sets out the law; (2) evidence supports the giving of the instruction; and (3) the substance of the instruction is not covered by the other instructions given." *Id.*

[19] Hutton tendered the following instruction: "An intervening cause is an independent force that breaks the causal connection between the actions and/or omissions of the Defendant and the death." Appellant's App. at 439. The trial

court refused to give the instruction but allowed Hutton to present an argument about intervening cause to the jury during closing argument. Tr. at 2249.

[20] Assuming, without deciding, that Hutton's instruction was a correct statement of the law[2] and that the evidence supported giving the instruction, we agree with the State that the substance of Hutton's proposed instruction was covered by other instructions:

FINAL INSTRUCTION NO. 8

"Proximate cause" is that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury (or death) and without which, the injury (or death) would not have occurred.

FINAL INSTRUCTION NO. 9

"Cause of death" is that event which initiates a chain of events, however short or protracted, that results in the death of an individual.

---

[2] Hutton asserts that his tendered instruction correctly defined intervening cause because it was drawn from *Carrigg v. State*, 696 N.E.2d 392 (Ind. Ct. App. 1998), *trans. denied*. However, in *Carrigg*, the court included additional information defining intervening cause:

> An intervening cause is an independent force that breaks the causal connection between the actions of the defendant and the injury. …. In order for an intervening cause to break the chain of criminal responsibility, the intervening cause must be so extraordinary that it would be unfair to hold the defendant responsible for the actual result.

*Id.* at 395-96; *see also Wooley v. State*, 716 N.E.2d 919, 928 (Ind. 1999) (same); *Watson v. State*, 776 N.E.2d 914, 920 (Ind. Ct. App. 2002) (same). Therefore, it could be argued that Hutton's tendered instruction may not be a complete definition of intervening cause.

> A conviction for causing death as alleged in Counts I-III of the charges against the defendant, Kyle Hutton, requires proof, beyond a reasonable doubt, that the defendant's conduct while operating the vehicle was the proximate cause of the deaths alleged.

Appellant's App. at 460.[3]

[21] These instructions defined proximate cause and informed the jury that there must be proof beyond a reasonable doubt that Hutton's conduct was the proximate cause of the deaths. In comparing the definition of proximate cause with Hutton's tendered instruction, we find them similar. Proximate cause was defined as that cause which, "unbroken by any efficient intervening cause," produced the deaths. *Id.* Hutton's proposed instruction defined intervening cause as an independent force that "breaks the causal connection." *Id.* at 439. Both instructions conveyed the concept that an intervening cause breaks the causal sequence. We are unpersuaded that Hutton's proposed instruction adds any information that would aid the jury.[4] Given that the substance of Hutton's tendered instruction was covered by the other instructions, we conclude that the trial court did not abuse its discretion by refusing Hutton's tendered instruction.

---

[3] To sustain a conviction for causing death when operating a vehicle, "the State must prove the defendant's conduct was a proximate cause of the victim's injury or death." *Abney v. State*, 766 N.E.2d 1175, 1177-78 (Ind. 2002). "Conduct," in the context of *Abney*, "is taken to mean the driver's act of operating the vehicle and not any particular way in which the driver operates the vehicle." *Spaulding v. State*, 815 N.E.2d 1039, 1042 (Ind. Ct. App. 2004).

[4] Hutton argues that the jury was confused because during deliberations it asked for a definition of proximate cause. Appellant's App. at 468. We are unpersuaded that Hutton's tendered instruction on intervening cause would have helped the jury with its question.

# Section 3 - The trial court did not abuse its discretion by admitting the test results of the Bedford Hospital blood draw.

[22] Hutton challenges the admission of the blood test results from the Bedford Hospital blood draw. Our standard of review is well settled:

> Generally, a trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. We will reverse only where the decision is clearly against the logic and effect of the facts and circumstances. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission of evidence constituted harmless error.

*Combs v. State*, 895 N.E.2d 1252, 1255 (Ind. Ct. App. 2008) (citations omitted), *trans. denied* (2009).

[23] Hutton contends that the blood test results from the Bedford Hospital blood draw are inadmissible for three reasons: (1) Officer Lee was not authorized under Indiana Code Section 9-30-7-3(a) to offer the blood test because he did not have a reason to believe that Hutton operated a vehicle that was in a fatal accident; (2) Hutton did not consent to the blood draw; and (3) the State failed to lay a proper foundation that Nurse Potter was acting under the direction of or under a protocol prepared by a physician as required by Indiana Code Section 9-30-6-6.

[24] Indiana's implied consent statutes appear at Indiana Code Chapters 9-30-6 and 9-30-7. Indiana Code Chapter 9-30-7 governs implied consent for drivers of vehicles in accidents involving serious bodily injury or death and therefore applies here. Under this Chapter, "[a] law enforcement officer shall offer a

portable breath test or chemical test to any person who the officer *has reason to believe* operated a vehicle that was involved in a fatal accident or an accident involving serious bodily injury." Ind. Code § 9-30-7-3(a) (emphasis added).[5] Hutton argues that there is insufficient evidence to support a legal conclusion that Officer Lee had reason to believe that Hutton had operated a vehicle involved in a fatal accident.[6] We disagree.

[25] Officer Lee knew that Hutton had been in the Jeep with three other people who had been thrown from the Jeep and had died. There is no question that the Jeep was involved in a fatal accident.[7] Officer Lee observed Hutton's pain and inability to breathe. Based on his experience, Officer Lee believed that these symptoms were consistent with injuries that would be incurred by hitting the steering wheel. Tr. at 835-36. Officer Lee asked Hutton if he was the driver,

---

[5] Indiana Code Section 9-30-7-3 does not require a showing of probable cause. *Temperly v. State*, 933 N.E.2d 558, 562 (Ind. Ct. App. 2010) (citing *Brown v. State*, 744 N.E.2d 989 (Ind. Ct. App 2001)), *trans. denied* (2011), *cert. denied*. *But see Hannoy v. State*, 789 N.E.2d 977, 982 (Ind. Ct. App. 2003) ("For purposes of [Chapter 9-30-7], police shall offer a chemical test to any driver whom the officer has probable cause to believe was involved in an accident resulting in serious bodily injury or death.") (citing *Brown*, 744 N.E.2d at 993). In contrast, Chapter 9-30-6, which governs operating a vehicle while intoxicated, explicitly requires that a law enforcement officer have "probable cause to believe" that a person was driving while intoxicated.

[6] Even though it is not required under Section 9-30-7-3(a), Hutton concedes that Officer Lee had probable cause to believe that he was intoxicated.

[7] In *Duncan v. State*, 799 N.E.2d 538 (Ind. Ct. App. 2003), we noted that it is acceptable for police to draw a person's blood without his consent if the blood draw is conducted in compliance with federal and state constitutional guarantees against unreasonable search and seizure. *Id*. at 542-43. Constitutional compliance requires that

> (1) there is probable cause to believe that the person has operated a vehicle while intoxicated; (2) the dissipation of alcohol in the blood creates exigent circumstances under which there is no time to secure a search warrant; (3) the test chosen to measure the person's blood alcohol concentration is a reasonable one; and (4) the test is performed in a reasonable manner.

*Id*.

but rather than denying it, Hutton only replied, "Come on man." *Id*. at 837. We conclude that Officer Lee had sufficient reason to believe that Hutton was driving the Jeep. Therefore, pursuant to Section 9-30-7-3(a), Officer Lee was required to offer Hutton a portable breath test or a chemical test.

[26] Hutton also argues that his response to the offer of the blood test was equivocal and cannot be deemed consent. We disagree. When Officer Lee read the implied consent card to Hutton, Hutton replied, "Whatever," and extended his arm. *Id*. at 838-39. Hutton's act of extending his arm is easily construed as a physical manifestation of consent, especially since he did not express, by word or action, any reluctance or objection to the blood test. Given these circumstances, we conclude that Hutton gave his consent to the blood draw.[8]

---

[8] "Consent" for purposes of Indiana's implied consent statutes is currently under review by our supreme court, which has granted transfer in *Burnell v. State*, 44 N.E.3d 771 (Ind. Ct. App. 2015). There, in response to the offer of a chemical test, Burnell argued with the officer about it and finally said, "Well if I refuse, I'm going to jail either way. So yeah, I guess I gotta take it." *Id*. at 774. At that point, Burnell began to walk away from the officer, and he grabbed her arm. She told him not to touch her and began moving away again. The officer deemed her behavior a refusal to take the chemical test and placed her under arrest. The trial court suspended Burnell's license for refusing the chemical test, and she petitioned for review of the suspension. After viewing the video from the in-car police camera, the trial court determined that her behavior constituted a refusal. Burnell appeal. This Court affirmed the trial court. In the lead opinion, Judge Pyle concluded that "anything short of an unqualified, unequivocal assent to a properly offered chemical test constitutes a refusal." *Id*. at 777. The author of this opinion concurred in result, stating, "I do not believe that we need go so far as to categorically hold that 'anything short of an unqualified, unequivocal assent to a properly offered chemical test constitutes a refusal.' Each case should be judged on its specific facts, and in my view the facts most favorable to the trial court's determination in this case are sufficient to affirm it." *Id*. at 778 (Crone, J., concurring in result) (citation omitted). Judge Brown dissented, explaining, "I would find that Burnell's statement was not 'substantially short of an unqualified, unequivocal assent,'" and therefore the evidence did not establish that she refused. *Id*. at 780 (quoting *State v. Pandoli*, 262 A.2d 41, 42 (N.J. Super. Ct. App. Div. 1970)).

Hutton further contends that the State failed to lay a proper foundation that Nurse Potter was acting under the direction of a physician or under a physician-prepared protocol as required by Indiana Code Section 9-30-6-6. Although Officer Lee offered Hutton a blood test under Chapter 9-30-7, Section 9-30-6-6 is applicable pursuant to Indiana Code Section 9-30-7-4(b), which provides,

> IC 9-30-6-6 applies if a physician or a person trained in obtaining bodily substance samples who is acting under the direction of or under a protocol prepared by a physician or who has been engaged to obtain bodily substance samples:
>
> > (1) obtains a blood, urine, or other bodily substance sample from a person at the request of a law enforcement officer who acts under this section; or
> >
> > (2) performs a chemical test on blood, urine, or another bodily substance obtained from a person under this section.

Section 9-30-6-6(a) provides:

> A physician or a person trained in obtaining bodily substance samples and acting under the direction of or under a protocol prepared by a physician, who:
>
> > (1) obtains a blood, urine, or other bodily substance sample from a person, regardless of whether the sample is taken for diagnostic purposes or at the request of a law enforcement officer under this section; or
> >
> > (2) performs a chemical test on blood, urine, or other bodily substance obtained from a person;

shall deliver the sample or disclose the results of the test to a law enforcement officer who requests the sample or results as a part of a criminal investigation. Samples and test results shall be provided to a law enforcement officer even if the person has not consented to or otherwise authorized their release.

[29] Hutton argues that, contrary to Section 9-30-6-6(a), Nurse Potter was not a physician or a person trained in obtaining bodily substances samples or acting under the direction of or under a protocol prepared by a physician. We observe that the statute is "designed as a tool to acquire evidence of blood alcohol content rather than as a device to exclude evidence." *Abney v. State*, 821 N.E.2d 375, 379 (Ind. 2005).

[30] Hutton recognizes that "Nurse Potter testified that her blood draw procedure was in conformity with a protocol approved by a physician." Appellant's Br. at 25. He contends that the State failed to offer into evidence a copy of the actual protocol that Nurse Potter testified that she had followed in obtaining the blood samples. The State counters that Nurse Potter's testimony alone was sufficient to show that she met the requirements of the statute.

[31] In support of his argument, Hutton relies on *Combs*, 895 N.E.2d 1252, in which this Court concluded that the trial court abused its discretion by admitting the results of the blood draw. At Combs's trial, the medical technologist who performed Combs's blood draw testified only as to how she did it. The court concluded that the State failed to lay a proper foundation because the record was "devoid of evidence" that a physician prepared the protocol and there was "absolutely no evidence" that the medical technologist acted under the

direction of a physician or that a physician prepared the protocol. *Id*. at 1258. *See also State v. Hunter*, 898 N.E.2d 455, 459 (Ind. Ct. App. 2008) (concluding that State failed to lay proper foundation where there was "absolutely no evidence" that hospital nurse who drew blood was acting under physician-prepared protocol).

[32] In contrast to *Combs*, this Court upheld the admission of blood test results in *Shepherd v. State*, 690 N.E.2d 318, 328 (Ind. Ct. App. 1997), *disapproved on other grounds*, *trans. denied* (1998). There, the medical technician testified that the protocol used to draw Shepherd's blood was prepared by the technical staff and then subsequently reviewed and approved by a physician. The protocol contained a doctor's signature certifying that the steps of the protocol were the accepted policy and procedures of the hospital. The court concluded that this evidence was sufficient to show that the protocol was prepared by a physician as required by Section 9-30-6-6. *Id*. at 328-29.

[33] This case falls somewhere between *Combs* and *Shepherd*. Here, Nurse Potter testified that on the evening that she performed Hutton's blood draw, Bedford Hospital had a protocol for collecting blood samples in place that was approved by a physician. Tr. at 1082. She explained, "When I talk about the draw protocol I am talking about how the blood is obtained from the patient and I use the [hospital] protocol." *Id*. at 1124. She testified that she was required to follow the hospital's physician-approved protocol for a forensic blood draw. *Id*. at 1082-83. She further testified that she follows the hospital's protocol every time she does a blood alcohol draw. *Id*. at 1100. She testified that the protocol

for a regular blood draw will be followed for a forensic blood draw, but that the forensic blood draw will have additional requirements to insure a tighter chain of custody and accurate documentation. *Id*. at 1123. Nurse Potter also explained the protocol for a blood alcohol draw to the jury. *Id*. at 1083-86. We conclude that Nurse Potter's testimony established a sufficient foundation that she drew Hutton's blood under a physician-prepared protocol, and therefore the blood draw complied with Section 9-30-6-6. Accordingly, the trial court did not abuse its discretion in admitting the Bedford Hospital blood draw results.

[34] Hutton also argues that the Methodist Hospital blood test results were inadmissible because the State failed to lay a proper foundation that Nurse Jackson was acting under the direction of or under a protocol prepared by a physician as required by Section 9-30-6-6. We need not address his argument because the Methodist Hospital blood test results are cumulative of the Bedford Hospital blood test results. The admission of evidence is harmless and is not grounds for reversal where the evidence is merely cumulative of other evidence properly admitted. *Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012). Because the trial court properly admitted the Bedford Hospital blood test results, any error in the admission of the Methodist Hospital blood test results is harmless.

## Section 4 – Hutton's sentence is appropriate.

[35] Finally, Hutton asks us to reduce his sentence pursuant to Indiana Appellate Rule 7(B), which states, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the

sentence is inappropriate in light of the nature of the offense and the character of the offender." When reviewing a sentence, our principal role is to leaven the outliers rather than necessarily achieve what is perceived as the correct result. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). "We do not look to determine if the sentence was appropriate; instead we look to make sure the sentence was not inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). Hutton has the burden to show that his sentence is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218.

[36] Turning first to the nature of the offense, we observe that "the advisory sentence is the starting point the Legislature selected as appropriate for the crime committed." *Pierce v. State*, 949 N.E.2d 349, 352 (Ind. 2011). The sentencing range for a class B felony is six to twenty years, with an advisory sentence of ten years. Ind. Code § 35-50-2-5. Hutton was sentenced to consecutive sentences of fourteen years on each count for an aggregate sentence of forty-two years. Here, Hutton's conduct was worse than that necessary to establish the class B felony. His ACE was estimated to be about 0.28 at the time of the crash, well beyond that required for his crime. Before the crash, he was offered a ride and declined. Further, when he left the scene of the crime, he did not stop at the nearby houses to seek immediate help for his wife and friends and delayed calling 911.

[37] As for Hutton's character, he has four prior arrests for alcohol-related offenses. In 2000, he was convicted of class C misdemeanor illegal consumption of an

alcoholic beverage in Lawrence County. In 2001, he was convicted of class A misdemeanor operating a vehicle while intoxicated in Marion County. While he was on probation, he was arrested for operating a vehicle while intoxicated endangering a person in Delaware County and was entered into a pretrial diversion program. While he was in the pretrial diversion program in 2002, he committed class C misdemeanor illegal consumption of an alcoholic beverage in Boone County. In 2002, he was also arrested for class C felony burglary, class D felony theft, and class A misdemeanor conversion in Marion County. In 2003, he entered into a plea agreement and pled guilty to class D felony theft and class A misdemeanor conversion, while the State dismissed the class C felony burglary. Later, his conviction for class D felony theft was modified to a class A misdemeanor.

[38] We agree with the trial court that Hutton's criminal history is a "clear indication of a pattern of conduct and failure to take responsibility for that conduct that ultimately led to the death of three individuals." Tr. at 2599-2600. As for the current offense, Hutton violated the conditions of his pretrial release by testing positive for the use of alcohol, after initially refusing to submit to the screening process, and driving with a suspended license. He has not sought treatment for his substance abuse since he committed the current offenses. The trial court found that he has not shown remorse or taken responsibility for his part in the deaths of his wife and friends. Accordingly, we conclude that Hutton has failed to carry his burden to show that his sentence is inappropriate based on the nature of the offenses and his character.

[39]    Affirmed.

Vaidik, C.J., and Bailey, J., concur.